

# The Attorney General of Texas

October 18, 1985

**JIM MATTOX**
Attorney General

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

714 Jackson, Suite 700
Dallas, TX. 75202-4506
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

1001 Texas, Suite 700
Houston, TX. 77002-3111
713/223-5886

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

Mr. O. L. McCotter
Director
Texas Department of Corrections
P. O. Box 99
Huntsville, Texas    77340

Opinion No. JM-362

Re: Interpretation of the Texas Prison Management Act, article 6184o, V.T.C.S.

Dear Mr. McCotter:

You ask several questions regarding the Texas Prison Management Act, article 6184o, V.T.C.S. An explanation of some of the provisions of that act is necessary to put your questions in context.

The act provides that if the inmate population of the Texas Department of Corrections [hereinafter TDC] reaches 95 percent or more of its housing capacity, you must notify the governor of that fact and credit 30 days of administrative good conduct time to certain categories of inmates. Id. §2(b). The act further provides that if the governor determines certain specified facts to be true, he must notify the Board of Pardons and Paroles that emergency overcrowding exists within 30 days of receiving your notice. Id. §2(c). Once the governor notifies the board of the emergency overcrowding, the board must advance the parole review and eligibility date of the same categories of inmates that received administrative good conduct time under section 2(b). Id. §2(d). If the emergency still exists 60 days after the governor's notification to the board, the board must again advance the parole review and eligibility date of such inmates. Id. §2(e). If the emergency still exists 120 days after the governor's notification to the board, the governor must order you to make another award of good conduct time to such inmates. Id. §2(f). The emergency ends when the inmate population is reduced to less than 95 percent of capacity:

---

1. In your letter you mention that a "pool" of inmates is identified when section 2(b) is implemented and imply that the subsequent measures set out in the act apply only to the inmates who received an award of good conduct time under section 2(b). Sections 2(d), (e), and (f) apply to "those inmates who are described by [section 2(b)]" rather than "those inmates who received awards of good conduct time under section 2(b)." Thus, sections 2(d), (e), and (f) apply to any inmate who meets the criteria set out in section 2(b) at the time those measures are applied.

> If after the governor declares that an emergency overcrowding situation exists, inmate population is reduced to less than 95 percent of capacity, the governor shall immediately notify the board that the emergency situation no longer exists.

Id. §2(g). The effectiveness of the act is critical to you because you have agreed in the Stipulation Modifying Crowding Provisions of Amended Decree in Ruiz v. McCotter that you will not allow your population to exceed 95 percent of capacity.

Several of your questions involve the timing of implementation of these provisions. First, you are concerned about the possibility that, for example, the inmate population could reach 95 percent on one day, dip below 95 percent on the next day, and then reach 95 percent again several days later. You ask whether section 2(b) would require you to award good conduct time on both of the days that the population reaches 95 percent of capacity or only on the first day. In such a situation you should award good conduct time only on the first day.

The act permits inmates to be released to prevent overcrowding, not to benefit the inmates. Implementation of section 2(b) sets the statutory scheme in motion. After you notify the governor of the situation, he has 30 days to notify the board that an emergency exists. If the inmate population is hovering near 95 percent, the governor can use those 30 days to determine where the population will stabilize. If the inmate population eventually settles at less than 95 percent of capacity, the governor need not notify the board that an emergency exists. Id. §2(c). If the population settles at 95 percent or higher, the governor must notify the board that an emergency exists. Id. Once the governor does so, the statute prescribes various measures to be taken and the intervals at which they are to be taken. The act's scheduling of the release mechanisms in a specific sequence and at specified intervals indicates that the legislature did not intend the act to authorize more frequent awards of good conduct time simply because of minor fluctuations in the inmate population.

Thus, once you implement section 2(b) by awarding administrative good conduct time and notifying the governor of the size of the inmate population, you would have no authority or obligation to implement section 2(b) again for at least 30 days. If the governor did declare an emergency, you would have no authority to implement section 2(b) during the implementation of the rest of the cycle. After the governor declared the emergency to be over, you would be required to implement section 2(b) again if the population reached 95 percent of capacity.

You also ask whether you could implement section 2(b) again if an emergency still existed after the implementation of the steps prescribed in sections 2(d), (e), and (f). The act does not provide for

a situation in which an emergency still exists after those steps have been taken. Apparently the legislature assumed that the measures set out in the statute would be sufficient to reduce the population below 95 percent. You are concerned, however, that those measures might not be adequate to meet an emergency because of the current rate of admissions.

If the inmate population is still at or above 95 percent of capacity after implementation of the measures set out in the act, then the steps must be repeated. We reach this conclusion by looking at the structure and purpose of the act. Article 6184o does not limit the number of times that the measures it prescribes can be used. As we pointed out previously, the statute would require you to initiate the cycle of ameliorative measures again if the population reached 95 percent again after the previous emergency had ended. Because the statute requires the measures to be repeated in the case of successive emergencies, it makes no sense to conclude that the statute would prohibit the measures from being repeated in the case of an intractable emergency.

The legislative history shows that such a construction comports with the purpose of the act. The year before the act was passed, TDC had responded to emergency overcrowding by refusing to admit new inmates. See S.B. No. 727, 68th Leg., Senate Committee on State Affairs (March 9, 1983). The sponsors of the act stated that their bill allowed accelerated release of non-violent prisoners in the event of emergency overcrowding and therefore provided "a way of keeping the front doors open while not jeopardizing in any way the safety of our citizenry." Id. Because the intent of the legislature was to end emergency overcrowding and to do so in a way that would keep the front door of the prison open, we think the act must be read to require the cycle of curative measures to begin again if the first cycle does not relieve the emergency.

You also ask when you must begin the cycle again. The act specifies that 60 days must elapse between implementation of sections 2(e) and 2(f). The act also specifies that 60 days must elapse between implementation of sections 2(f) and 2(g). Consequently, 60 days must elapse after implementation of 2(g) before you start the cycle again by implementing section 2(b).

In addition to your questions regarding the timing of the measures set out in the act, you ask:

> May the Texas Board of Corrections delegate its responsibility to establish 'capacity' to the director of TDC?

It is not clear from your letter whether you are asking about setting the standards for determining capacity or applying those standards.

The act explicitly authorizes the Texas Board of Corrections to set the standards used to determine the number of prisoners the prison system could house:

> 'Capacity' means the greatest density of prison inmates in relation to space available for inmate housing in the Texas Department of Corrections that is in compliance with standards for prison population by the Texas Board of Corrections.

Art. 6184o, §1(a)(1). Public duties that require the exercise of discretion must be performed by the officials designated by statute and cannot be delegated to others. Newsom v. Adams, 451 S.W.2d 948, 953 (Tex. Civ. App. - Beaumont 1970, no writ); Moody v. Texas Water Commission, 373 S.W.2d 793, 797 (Tex. Civ. App. - Austin 1963, writ ref'd n.r.e.). A state board can, however, delegate ministerial duties. See Attorney General Opinions V-350 (1947); WW-66 (1957). Thus, the board cannot delegate its duty to set standards. The board can, however, delegate the ministerial duties involved in determining capacity, such as counting beds.

Finally, you ask about the meaning of the provision in the act that states that temporary housing may not be considered for purposes of the calculations of capacity. Art. 6184o, §1(b). You point out that the overcrowding stipulation in Ruiz, which contains a general prohibition against the use of temporary housing structures, does permit the use of tents for roving inmate construction crews and for inmates displaced from regular housing because of renovations. You ask:

> May temporary housing be considered in calculations for capacity, assuming such temporary housing meets the standards set by the stipulation in Ruiz?

Although the Texas Prison Management Act, which was adopted in 1983, obviously did not incorporate the subsequent Ruiz stipulation regarding temporary structures, the Ruiz case was in the minds of the legislators when they adopted the act. During a committee hearing on the act the following exchange took place:

> SENATOR X: We assume that the judgment of Judge Justice requires that we be brought into compliance without temporary housing by the first of 1984. I don't find 'temporary housing' defined. If we went to a temporary building like you see at schools sometimes for dormitory purposes, rather than tents, do you believe that we would have to exclude those then in determining whether we were at the 94 percent or 95 percent?

SENATOR Y: I don't believe so. We might ought to make a little intent on that.

SENATOR X: I'll assist in that regard. What you're talking about here on temporary housing, basically, is the tents [then being used on prison grounds] and three-celling.

SENATOR Y: Absolutely.

S.B. No. 727, Acts 68th Leg., Senate Committee on State Affairs (March 9, 1983).

The legislative history makes clear that the legislature wanted to prohibit the permanent use of makeshift living facilities and that Ruiz was the motivation for doing so. The act was not intended to impede the use of roving inmate construction crews or the use of makeshift structures in exigent circumstances. See art. 6184o, §2(h) (providing that the act does not apply in case of disaster). Accordingly, we think the act would permit the inclusion of makeshift structures in calculations of capacity in some out-of-the-ordinary and short-lived situations. Of course, merely reaching or exceeding 95 percent of capacity is not such an exigent circumstance. One point of the act is to prohibit the expansion of capacity by use of makeshift housing. The propriety of counting makeshift structures in capacity depends on the particular facts of any given situation, and the Board of Corrections would have to make the necessary determination as part of its duty to define "capacity." Although we cannot say that the Ruiz settlement itself is incorporated in the act, the Board of Corrections should bear in mind the legislature's desire to resolve the overcrowding issue being litigated in Ruiz when it sets any standards for determining capacity.

## S U M M A R Y

If the inmate population of the Texas Department of Corrections reaches 95 percent of capacity on one day, dips below 95 percent the next, and reaches 95 percent again on the third day, the director of the Texas Department of Corrections should award administrative good conduct time only on the first day the population reaches 95 percent of capacity. V.T.C.S. art. 6184o, §2(b).

The Texas Department of Corrections must start the cycle of curative measures set out in the Prison Management Act again if the first cycle fails to reduce prison population below 95 percent of capacity.

The Board of Corrections may delegate the ministerial aspects of determining capacity to the Texas Department of Corrections.

In some circumstances, the Board of Corrections may include makeshift housing in its standards for determining capacity.

Very truly yours

JIM MATTOX
Attorney General of Texas

TOM GREEN
First Assistant Attorney General

DAVID R. RICHARDS
Executive Assistant Attorney General

ROBERT GRAY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Sarah Woelk
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Rick Gilpin, Chairman
Colin Carl
Susan Garrison
Jim Moellinger
Jennifer Riggs
Nancy Sutton
Sarah Woelk